IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION


UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )    DR-13-CR-898(1)-DAE
    )
vs.    )
    )
SANTIAGO CARRANZA,    )
    )
    Defendant.    )
_____ )

## ORDER DENYING MOTION TO SUPPRESS

Before the Court is a Motion to Suppress all evidence obtained after a

traffic stop in Eagle Pass, Texas, filed by Defendant Santiago Carranza

("Defendant").  (Dkt. # 23.)  The Court heard argument on October 22, 2013.

Upon careful consideration of the supporting and opposing memoranda and the

arguments and testimony at the hearing, as well as the evaluation of the credibility

of the witnesses, the Court **DENIES** Defendant's Motion to Suppress.

## BACKGROUND

On June 5, 2013, Supervisory Border Patrol Agents Orlando

Chavarria and Joseph Sandford conducted roving border patrols in Eagle Pass,

Texas.  At approximately 3:40 a.m., sensor activity[1] along the border alerted agents

_____

[1]    The United States Border Patrol strategically places sensors along the
border.  When set off, the sensors alert Border Patrol agents that there has been an

1

to three individuals near the Las Brisas neighborhood. Las Brisas is approximately one to two miles from the Texas-Mexico border.

At around 4:15 a.m., forty minutes after the sensor activity alert, the agents observed Defendant driving a light brown Toyota Sequoia leaving Las Brisas. Defendant stopped at a three-way intersection, and the agents arrived shortly thereafter in a perpendicular lane. Despite coming to the intersection first, Defendant noticeably paused at the intersection for a significant period of time, presumably to let the agents pass before him. After the agents left the intersection, Defendant eventually exited onto Memo Robinson Road towards the El Indio Highway.

Upon seeing Defendant driving a Toyota Sequoia, Agent Chavarria recalled a "lookout report" indicating that three Toyota Sequoias were being utilized as "scout vehicles"[2] to smuggle aliens between 4:00 and 6:00 a.m. to blend in with oil field traffic, which typically travels in the early morning.

The agents proceeded to follow Defendant, who was traveling well below the speed limit on the El Indio Highway. The agents observed that

_____

entry. Border Patrol agents are then dispatched to discover if the sensors alerted to animal or human traffic.

[2]     A scout vehicle does not actually transport illegal aliens; rather, a scout vehicle travels near the "load vehicle" carrying the aliens and alerts the load vehicle if police are in close proximity. A scout vehicle also serves as a distraction to police so that the load vehicle can continue the transport.

Defendant was driving approximately thirty miles per hour in a forty-five-mile-per-hour zone. Agent Chavarria testified that this was highly unusual on that highway at the time of the morning. The agents passed Defendant in the left-hand lane and noticed that Defendant did not make eye contact. Rather, Defendnat glanced at the agents nervously while tightly gripping the steering wheel.

The agents, now ahead of Defendant's vehicle, stopped and waited at Loop 480 to see if Defendant would take the loop and head into Eagle Pass or continue towards FM 2644, a road that circumvents Border Patrol checkpoints. As Defendant approached, the agents noticed that he was continuing to drive remarkably slowly along the El Indio Highway. At this point, the agents estimated that Defendant was driving thirty to forty miles per hour in a sixty-mile-per-hour zone.

The agents then conducted a registration check on Defendant's vehicle, which revealed that Defendant's Toyota Sequoia was registered to Santiago Carranza (Defendant) in Grand Prairie, Texas, a city outside of the Dallas metropolitan area. The agents also noticed Defendant's license plate cover indicated that the vehicle had been purchased in the Dallas area.

While following Defendant on the El Indio Highway, the agents observed Defendant pass an Isuzu Rodeo. After Defendant passed, he quickly put on a turn-signal light and pulled in front of the Isuzu Rodeo. Believing the two

vehicles may be driving in tandem, the agents suspected the Isuzu Rodeo might be the "load vehicle" carrying the three potentially illegal aliens that had alerted the sensors earlier that morning. As such, the agents conducted an immigration inspection on the Isuzu Rodeo. The inspection revealed that the Isuzu was not engaged in illegal activity.

The agents subsequently returned their attention to Defendant's Toyota Sequoia, then believing it to be the load vehicle. The agents performed an immigration inspection stop at around 4:30 a.m. The stop took place approximately one and a half miles from the Texas-Mexico border. During the stop, Agent Chavarria noticed that Defendant was wearing a white hard hat and orange reflective vest and that Defendant had not been wearing these items when the agents had passed him earlier. As Agent Sandford conducted the immigration inspection, Agent Chavarria noticed a large military-style duffle bag in plain view in the cab of Defendant's Sequoia. Agent Chavarria asked Defendant in Spanish if he had any marijuana in the vehicle. Defendant responded "sí," which meant "yes" in Spanish.

After Defendant's affirmative response confirming the presence of marijuana in the vehicle, the agents placed Defendant under arrest. A search of the vehicle revealed three military-style duffle bags containing a net weight of 100.4 kilograms of marijuana.

<u>DISCUSSION</u>

Defendant asks this Court to suppress the evidence seized after the Border Patrol agents conducted the immigration stop because the agents lacked the requisite reasonable suspicion to conduct a stop of Defendant's vehicle. Defendant asserts that because reasonable suspicion did not exist for the initial stop, all evidence collected as a result of the alleged unconstitutional seizure should be suppressed as fruit of the poisonous tree.[3]

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Traffic stops—including traffic stops for immigration inspections—are considered seizures within the meaning of the Fourth Amendment. <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 882–84 (1975). "To temporarily detain a vehicle for investigatory purposes, a Border Patrol Agent on roving patrol must be aware of 'specific articulable facts' together with [a] rational inference from those facts,

---

[3] Defendant does not ask this Court to assess the scope of the agents' seizure of the marijuana found in Defendant's vehicle. However, as noted above, once the agents conducted the immigration inspection, Agent Chavarria noticed a large military-style duffle bag <u>in plain view</u>. Agent Chavarria recognized the bag as one commonly used to transport illegal narcotics. But rather than seize the bag, <u>see</u> <u>Horton v. California</u>, 496 U.S. 128, 137 (1990) (explaining that for a valid plain view seizure, the incriminating character must also be "immediately apparent"), Agent Chavarria asked Defendant if he had marijuana, to which Defendant responded that he did.

that warrant a reasonable suspicion that the vehicle is involved in illegal activities, such as transporting undocumented immigrants." United States v. Garza, 727 F.3d 436, 440 (5th Cir. 2013) (quoting United States v. Chavez–Chavez, 205 F.3d 145, 147 (5th Cir. 2000)). Reasonable suspicion "requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." Id. (quoting United States v. Gonzalez, 190 F.3d 668, 671 (5th Cir. 1999)).

In Brignoni–Ponce, the Supreme Court laid out a multi-factored analysis to decide "whether there is reasonable suspicion to stop a car in the border area." 422 U.S. at 885. These factors include: (1) proximity to the border; (2) the characteristics of the area where the vehicle was encountered; (3) any unusual traffic pattern on the road; (4) the arresting agents' previous experience with criminal activity; (5) information about recent criminal activity in the area; (6) the driver's behavior; (7) the appearance of the vehicle, including the vehicle type and whether the vehicle appears loaded; and (8) the number, appearance, and behavior of the passengers. Id. "No single factor is determinative; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers." United States v. Moreno–Chaparro, 180 F.3d 629, 631–32 (5th Cir. 1998). The Court will examine each Brignoni-Ponce factor in turn.

1.     Proximity to the Border

"The first factor, proximity to the border, is a 'paramount factor' in determining reasonable suspicion." United States v. Zapata-Ibarra, 212 F.3d 877, 881 (5th Cir. 2000) (quoting United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999)). This factor asks whether the agents had "reason to believe that the vehicle ha[d] come from the border." United States v. Rodriguez-Rivas, 151 F.3d 377, 380 (5th Cir. 1998). Although the Fifth Circuit does not adhere to a bright-line test, "a car traveling more than fifty (50) miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." Zapata-Ibarra, 212 F.3d at 881 (quoting United States v. Jones, 149 F.3d 364, 368 (5th Cir. 1998)). "Anything less than 50 miles therefore implicates the proximity factor." Garza, 727 F.3d at 441. In the present case, the agents observed Defendant's Toyota Sequoia one to two miles from the Mexico border—well under the fifty-mile benchmark.

Defendant argues that the proximity factor should not weigh in the Government's favor because he was not observed coming from the border. But the proximity factor does not require the agents to physically observe a suspect's vehicle driving from the border. The test is "whether arresting agents could reasonably conclude a particular vehicle originated its journey at the border." United States v. Nichols, 142 F.3d 857, 866 (5th Cir. 1998) (emphasis added); see

also <u>Zapata-Ibarra</u>, 212 F.3d at 881 (holding that when officers encountered defendant's vehicle twenty-four miles from the border, it was "reasonable to consider it likely" that the defendant's journey had originated at the border).

Alternatively, Defendant argues that the proximity element is not satisfied here because Agent Chavarria testified at the suppression hearing that he did not suspect that Defendant had come from the border—let alone "reasonably conclude" that Defendant's vehicle had originated its journey at the border as required by <u>Nichols</u>. <u>See</u> 142 F.3d at 866. Defendant is correct. If an agent specifically denies believing that a suspect originated his journey at the border, then the proximity element is not—and cannot—be satisfied, because the agent did not—and could not—"reasonably conclude" that the suspect's vehicle originated its journey at the border. <u>See</u> <u>United States v. Salazar-Martinez</u>, 710 F.2d 1087, 1088 (5th Cir. 1983) (holding that "[i]f there is no proof that the agent reasonably believed that the vehicle ha[d] crossed the border in a case," then the proximity element does not weigh in favor of reasonable suspicion).

The Government argues that the agents observed Defendant within two miles of the border, and thus the proximity element is satisfied because Defendant was traveling within the Fifth Circuit's fifty-mile benchmark. But the Government misses the underlying premise of the fifty-mile benchmark: It is a proxy for determining whether the arresting agent could reasonably conclude that a

particular vehicle had originated its journey at the border. See United States v.

Jacquinot, 258 F.3d 423, 428 (5th Cir. 2001) ("Although [the Fifth Circuit] does

not adhere to a bright line test with regard to this factor, a car traveling more than

50 miles from the border is usually viewed as being too far from the border to

support an inference that it originated its journey there." (emphases added)).

Therefore, because Agent Chavarria specifically disavowed believing that

Defendant's vehicle had come from the border, the Court finds that the proximity

element is not satisfied.

However, the Court notes that the agents were advised that three

individuals had come across the Texas-Mexico border and had entered the Las

Brisas neighborhood near the time that the agents observed Defendant's vehicle

leaving Las Brisas. It is quite common for vehicles to "pick up" undocumented

aliens in close proximity—though not exactly on the border—for transport north of

the border. So while the strict "proximity" factor is not met here because Agent

Chavarria denied believing Defendant's vehicle came from the border, the agents'

knowledge that Defendant's vehicle was leaving an area known for smuggling near

the time when the sensors had alerted to potential smuggling activity is still highly

relevant in this case.

Moreover, the absence of the proximity element does not preclude a

finding of reasonable suspicion. United States v. Inocencio, 40 F.3d 716, 722–23

(5th Cir. 1994) ("[I]f the agents do not base the stop on the vehicle's proximity to the border, Brignoni-Ponce may still be satisfied if other articulable facts warrant reasonable suspicion." (citing United States v. Henke, 775 F.2d 641, 645 (5th Cir. 1985))); Salazar-Martinez, 710 F.2d at 1088 (holding that the proximity factor is not a controlling Brignoni-Ponce factor if other articulable facts gave rise to the requisite reasonable suspicion). But if the proximity element is not satisfied, as in the instant case, the remaining Brignoni-Ponce factors are examined cautiously. Inocencio, 40 F.3d at 723.

2.    Known Characteristics of the Area

"It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." Zapata-Ibarra, 212 F.3d at 881 (quoting United States v. Aldaco, 168 F.3d 148, 151–52 (5th Cir. 1999)). According to the Government, the Las Brisas neighborhood is a "known staging area for the smuggling of illegal aliens or narcotics." At the hearing, Agent Chavarria testified that Las Brisas's proximity to a river makes it a well-known neighborhood for smuggling. Agent Chavarria noted that there are "stash houses" in the area as well.

Defendant argues that the Las Brisas neighborhood is traversed by law-abiding citizens and that, therefore, the character of Las Brisas cannot contribute to finding reasonable suspicion. It is true that "[r]oads near the border

10

carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well." Brignoni-Ponce, 422 U.S. at 882. A court cannot infer reasonable suspicion from facts that are consistent with day-to-day activities of the law-abiding public. See United States v. Chavez-Chavez, 205 F.3d 145, 148 (5th Cir. 2000) ("A factual condition that is consistent with alien smuggling does not provide reasonable suspicion if that condition also occurs even more frequently in the law-abiding public."); see also United States v. Rangel-Portillo, 586 F.3d 376, 381 (5th Cir. 2009) (holding that the court could not infer reasonable suspicion from the fact that the suspects wore seatbelts, sat rigidly, refrained from talking to each other, and had no shopping bags because "law-abiding individuals [were] just as likely, if not more likely, to wear their seatbelts, sit rigidly, and refrain from conversing with one another as they exit[ed] a Wal-Mart parking lot").

In United States v. Villalobos, the Fifth Circuit addressed whether the characteristics of an area could contribute to the officers' reasonable suspicion when the defendant argued that he could have been returning from a legitimate tourist destination. 161 F.3d 285, 289 (5th Cir. 1998). The Fifth Circuit found that "the possibility that Villalobos could have been an innocent traveler from Presidio or Shafter does not negate the fact that the area through which he was driving was both very close to the border and heavily traversed with border traffic." Id.

As in Villalobos, though Defendant could have been innocently

driving through Las Brisas, this does not negate the fact that Defendant was driving in an area known for the smuggling of illegal aliens and narcotics at the very time when the agent had been alerted to sensor activity in the Las Brisas area. Consequently, the known characteristics of the Las Brisas neighborhood weigh in favor of finding reasonable suspicion.

3.    Any Unusual Traffic Pattern on the Road

Although traveling at an unusual time of day alone may not give rise to reasonable suspicion, it is a permissible consideration. United States v. Samaguey, 180 F.3d 195, 198 (5th Cir. 1999); see also Aldaco, 168 F.3d at 152 (finding the officer's observation that "traffic [was] usually scarce on Highway 85 after eight or nine o'clock in the evening" relevant in the reasonable-suspicion analysis).

Here, however, Agent Chavarria testified that it was not unusual to see traffic in the Las Brisas neighborhood or on the El Indio Highway at approximately 4:00 a.m. due to the oil field traffic. Accordingly, the Court notes that the time of day Defendant was driving does not weigh in favor of finding reasonable suspicion. Although Defendant's manner of driving at the time of morning, as discussed infra, does cut in favor of reasonable suspicion.

4.    Agents' Previous Experience with Criminal Activity

The Supreme Court in Brignoni–Ponce recognized the importance of

12

an officer's experience in the field and the inferences he may reasonably draw from that experience. 422 U.S. at 885. Brignoni-Ponce noted: "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." Id.

Supervisory Border Patrol Agent Chavarria has eight years of experience as a Border Patrol Agent and four years of experience as a supervisory Border Patrol agent. He has been working on the Texas-Mexico border for his entire career of over twelve years. Supervisory Border Patrol Agent Sandford has nine years of experience as a Border Patrol agent and six years of experience as a supervisory Border Patrol agent. He has been on the Texas-Mexico border for twelve years. During the course of their careers, both agents have become well acquainted with the known smuggling routes, including areas like the Las Brisas neighborhood. Both agents are also familiar with the characteristics of traffic, including oil field traffic, that occurs throughout the larger Eagle Pass community. Accordingly, the Court views the Brignoni-Ponce factors in light of the agents' combined seventeen-year experience as a roving patrol agents. See Chavez-Chavez, 205 F.3d at 149 (holding that agents who had "developed substantial experience in detaining illegal aliens on [a particular] stretch of highway" was "of considerable importance in evaluating the totality of circumstances").

5.  <u>Information about Recent Criminal Activity in the Area</u>

As noted above, the agents were alerted to Defendant's vehicle after a sensor "hit" indicated potential smuggling activity in the Las Brisas neighborhood.

A sensor hit alone will not create reasonable suspicion for an investigatory immigration stop.  <u>Inocencio</u>, 40 F.3d at 723.  But a sensor hit, together with other <u>Brignoni-Ponce</u> factors, may justify such a stop.  <u>Id.</u>  In <u>United States v. Aguirre-Valenzuela</u>, sensor hits alerted agents that a vehicle was traveling east toward the agents.  700 F.2d 161, 162 (5th Cir. 1983) (per curiam).  Approximately twenty-five minutes after the first sensor hit, a 1969 brown Chevrolet passed agents heading east.  <u>Id.</u>  As the Chevrolet passed, the agents turned on their headlights and saw that there were four or five people in the car.  <u>Id.</u>  The agents subsequently saw the car drive erratically and then initiated an immigration stop.  <u>Id.</u>  The court found that although the "time-space/continuum" was "less than perfect," "the timing of the sensor alerts and the arrival of the [defendant's] car at the agents' location certainly were coincident enough to allow a reasonable inference that this was the car which had hit the sensors."  <u>Id.</u> at 163.

In this case, approximately forty minutes after the sensor hit, the agents observed Defendant driving his Toyota Sequoia near the area of the sensor hit.  When the agents saw Defendant's Toyota Sequoia, the agents recalled the lookout report, which had indicated that Toyota Sequoias were being used as "lead

cars" that would travel in close proximity to a load car and divert police attention if necessary. Thus, the agents suspected that Defendant's vehicle was serving as a "lead car" and was traveling near a load car. Because the sensor hit had alerted to potential illegal immigration activity near the area where Defendant was driving and agents suspected Defendant's vehicle was traveling near the load car, the agents reasonably suspected that Defendant was involved in illegal immigration activity of some kind.

6. Driver's Behavior

"It is beyond dispute that Border Patrol agents may consider the behavior of a vehicle's driver in determining whether there is reasonable suspicion to stop that vehicle." Nichols, 142 F.3d at 868. A driver's behavior, including "erratic driving" or "obvious attempts to evade officers," contributes to an officer's reasonable suspicion. Brignoni–Ponce, 422 U.S. at 885. Even a driver's deceleration, though commonly an innocuous response, may be a factor contributing to the reasonable suspicion justifying a stop. Villalobos, 161 F.3d at 292. This is especially true when a defendant noticeably decelerates after agents pull in front of his vehicle, even though he was not speeding. Id. at 291.

In this case, the agents noticed Defendant driving very slowly: fifteen miles per hour under the speed limit, and later—once Defendant saw the Border Patrol vehicle—nearly twenty to thirty miles per hour under the speed limit.

Defendant drove so slowly that the agents inferred that he was intending to distance himself from the Border Patrol vehicle. This suspect behavior, especially after the agents had passed Defendant, supports a finding of reasonable suspicion.

Additionally, Defendant's slow driving raised suspicions because according to Agent Chavarria, the typical oil field traffic at 4:00 a.m. moved quickly. See United States v. Garcia, 732 F.2d 1221, 1225 n.4 (5th Cir. 1984) (considering the defendant's exceptionally slow speed as a factor in the reasonable suspicion calculus because it was very unusual to observe vehicles traveling that late at night at such a slow speed).

Although deceleration can be a factor in the reasonable suspicion analysis, the Court notes that it is not exclusively relying on this factor. In United States v. Hernandez-Mandujano, the Fifth Circuit held that the defendant's deceleration upon passing the border patrol agents was unpersuasive and due little weight because this was a reaction of a cautious driver. 721 F.3d 345, 350 (5th Cir. 2013) (citing Samaguey, 180 F.3d at 198–99). However, the court in Hernandez-Mandujano did note that "driving below the speed limit may, combined with other circumstances, contribute to reasonable suspicion." Id. (citing Samaguey, 180 F.3d at 198–99 (finding the fact that the defendant continued to drive under the speed limit contributed to reasonable suspicion when agents stopped him at 5:45 a.m. about twenty miles from the border, at a time and on a

road known for smuggling of illegal aliens and drugs); Villalobos, 161 F.3d at 289–92 (holding that deceleration was "one factor contributing to the reasonable suspicion" where the defendant had been stopped fifty-nine miles north of the Mexican border after 2:20 a.m. on a route known for alien and drug trafficking (especially late at night) and the agents had a tip the car was likely smuggling drugs and had observed the car driving in the lead car/load car arrangement)).

As in Samaguey and Villalobos, Defendant's deceleration was one of a number of factors that contributed to the agents' reasonable suspicion. The Court considers Defendant's deceleration along with the known characteristics of the Las Brisas neighborhood (and its close proximity to the border), the lookout report indicating that Toyota Sequoias were being used as scout vehicles for smuggling activity, and the fact that vehicles driving in the early morning hours usually drove quickly.

Moreover, the Court notes that while stopped at the intersection, Defendant waited a considerable amount of time. The agents found this behavior unusual, especially in light of the fact that Defendant had noticeably arrived at the intersection first. The agents interpreted the pause at the intersection as another attempt to put some distance between Defendant's vehicle and the agents. As such, the Court considers Defendant's evasive pause at the intersection as another factor in the reasonable suspicion analysis.

Finally, the Court finds it particularly relevant that Defendant appeared to nervously and tightly grip the steering wheel once the agents had passed his vehicle. See United States v. DeLeon–Reyna, 930 F.2d 396, 403–04 (5th Cir. 1991) (finding it relevant that "the defendant, Mario De Leon–Reyna, appeared nervous and became rigid when he passed Martinez's marked patrol car").

Cumulatively, Defendant's slow driving, noticeable pause at the intersection, and nervous appearance convince this Court that reasonable suspicion existed.

7.  Appearance of the Vehicle

The Court initially notes that Defendant's Toyota Sequoia matched the description provided by the lookout report, which found that Toyota Sequoias were being used as scout vehicles from 4:00 to 6:00 a.m. to blend in with oil field traffic. Although the anonymous lookout report is not independently sufficient to conclude that reasonable suspicion existed, see United States v. Martinez, 486 F.3d 855, 862 (5th Cir. 2007) (noting that in Florida v. J.L., 529 U.S. 266 (2000), a "unanimous Supreme Court found that the anonymous tip was insufficient to create reasonable suspicion"), the lookout report does contribute to a finding of reasonable suspicion under the totality of circumstances. This is especially true because Defendant was driving at approximately 4:00 a.m., the same time the

lookout report predicted that Toyota Sequoias would be involved in illegal smuggling activities.

But, as Defendant correctly notes, it is true that Toyota Sequoias are commonly purchased vehicles. In fact, the Border Patrol agents in this case drove a Toyota Sequoia themselves. See Chavez-Chavez, 205 F.3d at 148 ("A factual condition that is consistent with alien smuggling does not provide a reasonable suspicion if that condition also occurs even more frequently in the law-abiding public.").

In United States v. Moreno-Chaparro, the Fifth Circuit declined to conclude that the agent had reasonable suspicion solely because the defendant had been driving a Chevrolet truck. 181 F.3d 629, 631–32 (5th Cir. 1998). The court stated that although "the Border Patrol carefully watches 'Chevys in general,' it would be manifestly unreasonable to target every Chevrolet pickup truck driven on Texas highways." Id. Indeed, the court ultimately found that the vehicle was "just an average pickup truck," noting that the "agent could not point to anything suspicious about [it] . . . . It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground as if it were loaded down with people or contraband; it was neither particularly clean nor particularly dirty." Id. at 632–33.

Unlike the Chevrolet truck in Moreno-Chaparro, Defendant's vehicle

was particularly clean. The Border Patrol agents noticed upon passing Defendant a second time that Defendant had put on a hard hat and reflective gear, purportedly to blend in with oil field traffic, like the lookout report had predicted. However, Agent Chavarria testified that oil field companies do not typically use Toyota Sequoias. Instead, oil field traffic generally consisted of wide heavy-duty pickup trucks and vehicles with trailers and cranes.

But even assuming that Toyota Sequoias are commonly associated with oil field traffic, Defendant's Sequoia was noticeably devoid of any debris frequently found on oil field trucks. See Nichols, 142 F.3d at 870 (noting that a clean vehicle devoid of any logos or markings was unusual in job-site area in the early morning). Defendant's Sequoia also had custom, shiny wheels, which was also very uncommon for oil field traffic. Furthermore, it was bought and registered in Grand Prairie, Texas, which was unusual for the typical oil field traffic seen in that area, at that time of day, in the middle of the week. See id. Agent Chavarria testified that vehicles normally seen throughout Las Brisas are registered in San Antonio, Carizzo, Eagle Pass, and even Louisiana where many oil field workers transfer from. Because Defendant's Sequoia was exceptionally clean and its registration was uncommon for the area, these two factors weigh in favor of finding reasonable suspicion.

8.    <u>Number, Appearance, and Behavior of Passengers</u>

Defendant argues that reasonable suspicion does not exist in this case because the agents saw only one person in the vehicle and this does not support any inference of alien smuggling. Defendant also asserts that the agents did not state that it looked like others might have been secreted in the vehicle. Defendant declares the absence of these two factors to be critical in the reasonable suspicion inquiry.

The Court notes that finding additional passengers in a suspect's vehicle is generally relevant in finding reasonable suspicion. <u>See, e.g.</u>, <u>Chavez-Chavez</u>, 205 F.3d at 149 (finding that five visibly unkempt adult passengers could be considered reasonably suspicious). But the lack of additional passengers does not necessarily mean that reasonable suspicion did not exist. For example, in <u>Villalobos</u>, the Fifth Circuit found reasonable suspicion despite the fact that the agents had not observed additional passengers in the defendant's vehicle. 161 F.3d at 290. <u>Villalobos</u> held that a driver who appeared to be traveling in a lead car/load car arrangement aroused reasonable suspicion. <u>Id.</u> The court noted that the two cars had been "driving within a quarter-mile of each other at a time and in a place where it was unusual to see more than one car every hour to hour and a half." <u>Id.</u> The court additionally emphasized that it was "more important" that there had been "evidence to bolster the lead car/load car

inference, . . . namely the tip that the Chrysler [that the defendant was driving] was likely to be smuggling drugs and the agents' knowledge that smugglers favored the lead car/load car arrangement." Id. (internal quotation marks and citation omitted). As such, the lack of additional passengers in a suspect's vehicle does not necessarily militate against finding reasonable suspicion that the suspect is involved in criminal activity.

Like the agents in Villalobos, the agents in the instant case did not initially suspect that Defendant was transporting any illegal aliens.[4] The lookout report relied on by Agent Chavarria indicated that Toyota Sequoias were being used as scout vehicles, also known as "lead cars." See United States v. Rodriguez-Rivas, 151 F.3d 377, 380–81 (5th Cir. 1998) (recognizing through an agent's testimony that a lead car is used to warn a following vehicle carrying contraband of the presence of law enforcement officers). Because the agents suspected Defendant's vehicle was a scout vehicle, the act that the agents did not detect additional passengers in Defendant's vehicle is not particularly availing in the reasonable-suspicion calculus.

However, Defendant is correct that the agents later—after discovering

---

[4] It was only when the agents performed an immigration inspection on the Isuzu Rodeo (initially believing it to be a load vehicle) that the agents returned their attention to Defendant's vehicle. After the inspection of the Isuzu Rodeo revealed that the Rodeo was not engaged in illegal immigration activity, the agents then believed that Defendant was transporting the load of three illegal aliens who had tripped the sensors earlier in the morning.

that the Isuzu was not the "load vehicle"—suspected that his vehicle contained the three illegal aliens that had triggered the sensors. And Defendant is also correct that the agents never observed any additional passengers in his vehicle. But the lack of additional passengers is only one factor to count against a finding of reasonable suspicion. The Court is not persuaded that the lack of additional passengers completely negates the other Brignoni-Ponce factors supporting a finding of reasonable suspicion. See Chavez-Chavez, 205 F.3d at 148 ("No single factor is determinative; rather, this Court examines each case based on 'the totality of circumstances known to the agent, and the agent's experience in evaluating such circumstances.'" (quoting Inocencio, 40 F.3d at 722)); Zapata–Ibarra, 212 F.3d at 884 (stating that not every Brignoni–Ponce factor need weigh in favor of reasonable suspicion and that an officer need not eliminate all reasonable possibility of innocent travel before conducting an investigatory stop). This is especially true in light of the fact that it is common knowledge that aliens could easily have been hidden inside the vehicle. Numerous Fifth Circuit cases have found reasonable suspicion even when additional passengers were not discovered until after the immigration stop. See, e.g., Garza, 727 F.3d at 442 (holding that the defendant's truck containing a sheet of plywood raised reasonable suspicion because persons could have been lying underneath it); United States v. Neufeld-Neufeld, 338 F.3d 374, 381–82 (5th Cir. 2003) (upholding a finding of reasonable

suspicion for a solo driver given the proximity to the border, use of a known

smuggling route, and nervous behavior); Jacquinot, 258 F.3d at 423 (holding that

reasonable suspicion existed, even though defendant was the only occupant in the

truck, where vehicle sensor alerts indicated that the truck was traveling very close

to border prior to the stop, the defendant was driving on a highway well known as

a smuggling route, the truck looked like a work truck but was leaving a park on a

Sunday morning, and the defendant decelerated in the presence of a patrol car and

took an indirect route to his destination).

   In conclusion, the Border Patrol agents identified "specific articulable

facts, together with rational inferences from those facts, that reasonably

warrant[ed] suspicion that the vehicle's occupant [was] engaged in criminal

activity." Brignoni-Ponce, 422 U.S. at 884. Defendant was driving in the Las

Brisas neighborhood, a well-known area for smuggling activities; the arresting

agents had extensive experience with the particular area; sensor activity alerted

agents that three potentially illegal aliens were in the United States; a lookout

report notified the agents that Toyota Sequoias, like Defendant's vehicle, were

being used as "scout vehicles" from 4:00 to 6:00 a.m., the span of time in which

Defendant was driving; Defendant was nervous, drove incredibly slowly, and

paused excessively at the intersection, presumably to gain some distance from the

agents; and Defendant's vehicle was excessively clean. These factors, along with

the others analyzed above, culminated in the agents' reasonable suspicion, and thus the agents' temporary detainment of Defendant's vehicle complied with the Fourth Amendment.

<u>CONCLUSION</u>

For the aforementioned reasons, this Court **DENIES** Defendant's Motion to Suppress.

IT IS SO ORDERED.

DATED: Del Rio, Texas, November 7, 2013.

_____

David Alan Ezra
Senior United States Distict Judge